**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Kenneth K. LIVESAY, Defendant–
Appellee.**

No. 06–11303.

United States Court of Appeals,
Eleventh Circuit.

April 19, 2007.

Joyce White Vance, Birmingham, AL, for U.S.

Sam Heldman, The Gardner Firm, Washington, DC, for Livesay.

Before HULL and MARCUS, Circuit Judges, and BARZILAY,* Judge.

PER CURIAM:

This is the second time the government has appealed the sentence of defendant-appellee Kenneth K. Livesay, the former Assistant Controller and Chief Information Officer of HealthSouth Corporation. *See United States v. Livesay*, 146 Fed.Appx. 403 (11th Cir.2005) ("*Livesay I*") (unpublished). In *Livesay I*, this Court vacated and remanded Livesay's sentence of pro-

* Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by

designation.

bation after concluding that the record provided a "scant basis to assess" the reasonableness of that sentence. *See id.* at 405. On remand, the district court again sentenced Livesay to probation, and this appeal followed. After review and oral argument, we once again vacate Livesay's sentence in its entirety, this time because the sentence is unreasonable.

## I. FACTUAL BACKGROUND

Earlier decisions of this Court outline the $1.4 billion criminal fraud scheme at HealthSouth. *See United States v. Martin,* 455 F.3d 1227, 1230–31 (11th Cir.2006); *United States v. McVay,* 447 F.3d 1348, 1349–50 (11th Cir.2006). Accordingly, in this opinion, we provide only a brief overview of that general scheme. We then detail Livesay's specific role in the fraud, as outlined in Livesay's Presentence Investigation Report ("PSI").[1]

At some point in the early to mid–1990s, HealthSouth officials realized that Health-South's financial results were failing to produce sufficient earnings-per-share to meet the expectations of Wall Street analysts. Various HealthSouth officials, including Livesay, became aware that the earnings shortfall created a substantial risk that, unless the earnings-per-share were artificially inflated, the earnings would fail to meet analyst expectations, and the market price of HealthSouth's securities would decline.

Therefore, from at least 1994 until March 2003, a group of HealthSouth officials "conspired to artificially inflate HealthSouth's reported earnings and earnings per share, and to falsify reports about HealthSouth's overall financial condition." *Martin,* 455 F.3d at 1230. The officials "made, and directed accounting personnel to make, false and fraudulent entries in

HealthSouth's books and records for the purpose of falsely reporting HealthSouth's assets, revenues, and earnings per share and in order to defraud investors, banks, and lenders." *Id.*

Livesay was the Assistant Controller in HealthSouth's accounting department between April 1989 and November 1999. According to the PSI, during his time as Assistant Controller, Livesay had access to all of the financial information on Health-South's balance sheets and income statements. As Assistant Controller, Livesay directly assisted the Controller and the CFO in preparing the financial statements and reports that HealthSouth was required to file with the SEC. Senior executives issued instructions to defendant Livesay regarding the desired earnings-per-share, and Assistant Controller Livesay and HealthSouth's accounting staff met to discuss ways to meet Wall Street's earnings-per-share expectations. As Assistant Controller, Livesay made false entries in HealthSouth's books and records to artificially inflate the company's earnings-per-share. Livesay also managed and supervised others in manipulating HealthSouth's books and records, instructing Health-South's accounting staff to alter certain accounts so as to inflate HealthSouth's earnings-per-share. Livesay participated in the preparation of HealthSouth's 1998 quarterly and annual reports that were filed with the SEC, and Livesay fully knew that the reports materially misstated HealthSouth's net income, revenue, earnings-per-share, assets, and liabilities.

## II. PROCEDURAL HISTORY

### A. Guilty Plea and Advisory Guidelines Range

Livesay pled guilty to an information charging him with: (1) conspiracy to com-

---

1. Before the district court, both Livesay and the government withdrew all objections to the PSI.

mit wire and securities fraud, in violation of 18 U.S.C. § 371 (Count One); and (2) falsification of financial information, in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), 78ff, and 18 U.S.C. § 2 (Count Two). The information also included a forfeiture count.

The probation officer's PSI set Livesay's base offense level at 6, pursuant to U.S.S.G. § 2F1.1(a).[2] Livesay's offense level was then enhanced by: (1) 18 levels, pursuant to U.S.S.G. § 2F1.1(b)(1)(S), because the loss amount exceeded $80 million; (2) 2 levels, pursuant to U.S.S.G. § 2F1.1(b)(2)(A), because the offense involved more than minimal planning; (3) 2 levels, pursuant to U.S.S.G. § 2F1.1(b)(5)(C), because the offense involved sophisticated means; and (4) 3 levels, pursuant to U.S.S.G. § 3B1.1(b), for Livesay's role in the offense as a manager or supervisor. After a 3–level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, Livesay's adjusted offense level was 28.

With an offense level of 28 and a criminal history category of I, Livesay's advisory guidelines range was 78 to 97 months' imprisonment. The government filed a U.S.S.G. § 5K1.1 motion for downward departure, based on Livesay's cooperation and substantial assistance. The government noted that Livesay: (1) met whenever needed with several government agencies, each of which had a substantial need for his assistance; (2) met with the forensic auditor reconstructing HealthSouth's books and records; (3) spent many hours reviewing financial statements and other documents; (4) provided the government with critical documents evidencing the fraud; (5) helped quantify the fraud; and (6) facilitated guilty pleas from other co-conspirators and the prosecution of others yet to be convicted.

*B. First Sentencing in June 2004*

At Livesay's first sentencing, the government's § 5K1.1 motion recommended a downward departure of 3 levels (from 28 to 25) and a sentence of 60 months' imprisonment. The district court granted the government's § 5K1.1 motion, but departed downward *18 levels*, to an offense level of 10. *Livesay I*, 146 Fed.Appx. at 404. Offense level 10, combined with Livesay's criminal history category of I, yielded an advisory guidelines range of 6 to 12 months' imprisonment. Because Livesay's guidelines range of 6 to 12 months' imprisonment fell within "Zone B" of the sentencing table, the guidelines gave the district court the option of sentencing Livesay to probation and 6 months' home detention without any additional guidelines departures. *See* U.S.S.G. §§ 5B1.1(a)(2), 5C1.1(c)(3) (permitting a sentence of probation, subject to certain conditions inapplicable here, if a defendant's applicable advisory guidelines range is within "Zone B").

The government objected to the reasonableness of the § 5K1.1 departure and also alternatively asked that Livesay be sentenced to the maximum sentence in that range (12 months' imprisonment). The district court nevertheless sentenced Livesay to 60 months' probation, with the first 6 months to be served on home detention, pursuant to U.S.S.G. §§ 5B1.1(a)(2) and 5C1.1(c)(3).[3] The district court also im-

---

2. The parties stipulated that the appropriate version of the Guidelines was the November 1998 edition; accordingly, all Guidelines citations are to the November 1998 edition unless otherwise noted.

3. After departing downward to an offense level of 10, the district court was able to sentence Livesay to 60 months' probation and 6 months' home detention without any addi-

posed a $10,000 fine and forfeiture of $750,000.

The government appealed, which resulted in our *Livesay I* decision. In *Livesay I*, this Court vacated Livesay's probation sentence and remanded Livesay's case to the district court for resentencing because the record did not "provide the minimum indicia required to allow us to review for reasonableness." *Livesay I*, 146 Fed. Appx. at 405.

## C. Resentencing in December 2005

The district court began Livesay's resentencing hearing with "preliminary remarks," in which the district court commented that "[l]urking not too far in the background of this sentencing is the jury's verdict in the *Richard Scrushy* case." Richard Scrushy was the Chief Executive Officer of HealthSouth at all times pertinent, and he was acquitted by the jury in his trial. The district court, speaking "not as one of twelve Article III judges of the court, but as the Chief Judge of the Northern District of Alabama," observed that he knew of no allegations that the jury in the *Scrushy* case had been in any way compromised. The district court publicly thanked the *Scrushy* jury for its "tremendous public service," and observed that before attacking the jury's verdict, "it is important to reflect on the fact that we did not sit here in the courtroom and hear and consider all of the evidence, as the jurors did."

The district court then proceeded to resentence Livesay. The government re-newed its § 5K1.1 motion, but in light of Livesay's continued substantial assistance since the first sentencing, the government recommended 20 months' imprisonment (i.e., less than its recommendation for 60 months' imprisonment at the first sentencing).[4]

The district court again granted the government's § 5K1.1 motion and "basically reimpos[ed] the original sentence" of probation. The district court first made specific § 5K1.1 findings, including that the significance and truthfulness of Livesay's information and testimony, as well as the nature and extent of his assistance, was "extraordinarily high" and warranted an "extraordinary departure." The district court further found that Livesay's assistance was "very timely" and warranted "extraordinary consideration." The district court then acknowledged that Livesay's "actions were not sufficient to meet the legal standards for withdrawing from a conspiracy," but nevertheless stated that it was "impressed with the fact that from just an ordinary, common sense understanding, [Livesay] did substantially withdraw from the conspiracy."

The district court then repeated the same earlier § 5K1.1 downward departure and departed downward 18 levels, to an offense level of 10, which once again left Livesay with an advisory guidelines range of 6 to 12 months' imprisonment.

At that point, the government asked to be heard before the district court imposed

---

tional guidelines departures because U.S.S.G. §§ 5B1.1(a)(2) and 5C1.1(c)(3) permit a sentence of probation, subject to certain conditions inapplicable here, if a defendant's applicable advisory guidelines range is within "Zone B" of the sentencing table. Because Livesay's offense level was 10 and criminal history category was I, Livesay fell within Zone B on the sentencing table. Thus, by imposing 6 months' home detention, the district court was able to sentence Livesay to 60 months' probation. *See* U.S.S.G. §§ 5B1.1(a)(2), 5C1.1(c)(3).

4. Between Livesay's first sentencing and resentencing, Livesay testified for the government at Scrushy's trial. Livesay also testified for the government at the trial of Sonny Crumpler and aided the government in preparing for both Scrushy's and Crumpler's trials.

its final sentence. While the government acknowledged that Livesay was "well deserving of a downward departure," the government stressed that Livesay also "was a key player, a significant cog, in the operation of this fraud at HealthSouth for a number of years." The government emphasized that although Livesay "did come forward early," he nevertheless "didn't come forward until the fraud itself was revealed." The government further observed that Livesay's "handiwork as one of the mechanics" of the fraud was reflected in the fraudulent forms that HealthSouth filed with the SEC. The government stressed the "need for deterrence" in sentencing Livesay, and stated its belief that some prison "sentence of significance" was necessary in light of the sentencing factors found in 18 U.S.C. § 3553(a). The government also renewed its request for a sentence of 12 months' imprisonment under the adjusted guidelines range found by the district court.

The district court then stated, "If I'm wrong on the extent of the departure which I have just made, I believe that the sentence I'm about to impose is the most appropriate sentence in consideration of the *Booker* case."[5] The district proceeded to sentence Livesay to 60 months' probation (the first 6 months to be served on home detention, which Livesay already had done). The district court also reimposed the $10,000 fine and forfeiture of $750,000, both of which Livesay had already paid.

With regard to the sentencing factors in 18 U.S.C. § 3553(a), the district court stated that it viewed the sentence as "appro-

priate" based on the "nature and circumstances" of Livesay's crime; Livesay's "history and personal characteristics"; the "need for this sentence to reflect the seriousness" of the crimes to which Livesay pled guilty; the need to "promote respect for the law, and to provide just punishment"; "and to afford adequate deterrence . . . ." The district court further stated that it considered the sentence "justified in order to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and noted the sentences imposed on various other HealthSouth co-conspirators.[6]

This appeal followed.

## III. DISCUSSION

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), district courts are still required to correctly calculate the appropriate advisory guidelines range. *See Martin*, 455 F.3d at 1235; *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir.2005). After correctly calculating the advisory guidelines range, the district court may then consider imposing a more severe or more lenient sentence, which this Court reviews for reasonableness in light of the factors in 18 U.S.C. § 3553(a). *See Martin*, 455 F.3d at 1235; *Crawford*, 407 F.3d at 1178. "We review *de novo* a district court's interpretation of the sentencing guidelines, including § 5K1.1, and its factual findings for clear error." *Martin*, 455 F.3d at 1235.

---

**5.** *See United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**6.** Among the sentences noted by the district court was the sentence of 5 months' imprisonment imposed on Emery Harris. According to Livesay's PSI, Harris was the Finance/Assistant Controller and Livesay was the Ac-

counting/Assistant Controller. The PSI states that Livesay instructed Harris to manipulate HealthSouth's books and records. The district court also noted, *inter alia*, that Weston Smith, the HealthSouth Controller from March 2000 through August 2001, received 27 months' imprisonment.

█ As to the § 3553(a) factors, "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court," but "we will remand for resentencing if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Williams*, 456 F.3d 1353, 1363 (11th Cir.2006); *see also United States v. Clay*, 483 F.3d 739, 743 (11th Cir.2007).

█ It is undisputed that the district court correctly calculated Livesay's advisory guidelines range of 78 to 97 months' imprisonment. Instead, the dispute on appeal is whether the extent of the district court's § 5K1.1 departure and the ultimate sentence of no imprisonment for this $1.4 billion securities fraud are reasonable. After careful review, we conclude that both the district court's § 5K1.1 departure and Livesay's ultimate sentence of probation were unreasonable.[7]

*A. Section 5K1.1 Departure*

█ First, as to the district court's § 5K1.1 departure, we acknowledge that once the government has made a § 5K1.1 motion, it has no control over whether and to what extent the district court will depart from the guidelines. *See Martin*, 455 F.3d at 1235; *McVay*, 447 F.3d at 1353. The only constraint is that the district court's departure must be reasonable. *See Martin*, 455 F.3d at 1235; *McVay*, 447 F.3d at 1353. Moreover, we fully accept the district court's determination that Livesay's cooperation was extraordinary and

merits a substantial departure. *See Martin*, 455 F.3d at 1238.

Nevertheless, the extent of the district court's § 5K1.1 departure alone is patently unreasonable in this case. Livesay's crimes yielded: (1) a statutory maximum of 15 years' imprisonment (i.e., 5 years on Count One and 10 on Count Two); and (2) an advisory guidelines range of 78 to 97 months' imprisonment (i.e., from 6.5 to approximately 8 years). Livesay played a key role in a massive, $1.4 *billion* fraud that extended over several years. Livesay made false entries in HealthSouth's books and records in furtherance of the fraud; instructed and supervised others in making such entries; and knew that HealthSouth was falsifying its financial information provided to the SEC. Livesay's cooperation, while commendable, extraordinary, and extremely valuable, is not a get-out-of-jail-free card, and "does not wash the slate clean." *Martin*, 455 F.3d at 1238. Yet departing 18 levels to a 6- to 12-month advisory guidelines range effectively accomplishes that by permitting a sentence of brief home confinement and no jail time at all. *See* U.S.S.G. §§ 5B1.1(a)(2), 5C1.1(c)(3). Given Livesay's key role in this massive fraud, the 18-level § 5K1.1 departure to a range allowing no imprisonment for Livesay's major league fraud crimes was unreasonable.

█ The § 5K1.1 departure also was unreasonable because the district court based the extent of its departure in part on the fact that Livesay "repudiated the conspiracy at an early time and no longer participated in it." In determining the extent of a § 5K1.1 departure, the district court must consider the non-exclusive factors set forth in § 5K1.1(a), which are:

---

**7.** We reject Livesay's argument that the government preserved an objection only to the extent of the district court's § 5K1.1 departure and not to the reasonableness of the overall sentence.

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; [and]

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a)(1)-(5). In addition, the district court may consider factors besides those listed in § 5K1.1(a), "but only if the factors relate to the assistance provided by the defendant." *Martin*, 455 F.3d at 1235; *see also McVay*, 447 F.3d at 1355.

Thus, Livesay's decision to repudiate the criminal conspiracy at an early time was not an appropriate fact for the district court to have considered in determining the extent of its § 5K1.1 departure. Livesay's early repudiation of the criminal conspiracy was unrelated to Livesay's assistance to the government and thus unrelated to any of the § 5K1.1(a) factors. It is clear from the context of the sentencing transcript that the district court considered Livesay's early repudiation of the conspiracy in determining the extent of its § 5K1.1 departure,[8] and that error further

rendered the district court's 18-level departure unreasonable.

This case is materially similar to *Martin*, in which defendant-appellant Michael Martin, the former HealthSouth Chief Financial Officer ("CFO"), pled guilty to conspiring to commit securities and mail fraud and to falsifying books and records.[9] *See Martin*, 455 F.3d at 1229-30. Martin's offense level was 31, his criminal history category was I, and his advisory guidelines range was 108 to 135 months' imprisonment. *See id.* at 1232.

In *Martin*, we concluded that both the extent of the district court's § 5K1.1 downward departure (23 levels, to an offense level of 8 and an advisory guidelines range of 0 to 6 months' imprisonment) and Martin's ultimate sentence (7 days' imprisonment) were unreasonable. *Id.* at 1238-39. While Livesay's 18-level departure is less than Martin's 23-level departure, both departures effectuate essentially the same result in that they allow for sentences of effectively no jail time for a $1.4 billion prolonged securities fraud that significantly injured many individuals, institutions, and companies.

### B. The Ultimate Sentence of Probation

Turning to Livesay's ultimate sentence, we conclude that Livesay's sentence of 60 months' probation is unreasonable under *Booker* and the § 3553(a) sentencing factors. We recognize that the district court stated that even if its § 5K1.1 departure was erroneous, it would have imposed the

---

8. We reject without further discussion Livesay's somewhat convoluted argument that the district court did not actually consider Livesay's repudiation of the conspiracy in determining the extent of its § 5K1.1 departure.

9. In *Martin*, as in this case, there were two appeals by the government. In the first appeal, this Court vacated Martin's original sentence of 60 months' probation with a special

condition of 6 months' home detention because the record was not capable of meaningful appellate review. *See Martin*, 455 F.3d at 1230. On remand, the district court sentenced Martin to 7 days' imprisonment, and the government appealed again, arguing, as it does here, that both the extent of the district court's § 5K1.1 departure and the overall sentence were unreasonable. *See id.* at 1234-35.

same sentence pursuant to its discretion under *Booker* and § 3553(a). *Cf. United States v. Paley*, 442 F.3d 1273, 1278–79 (11th Cir.2006). However, the district court's sentence of probation "wholly fails to serve the purposes of sentencing set forth by Congress in § 3553(a)," *Martin*, 455 F.3d at 1239, and leaves us "with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range" of reasonableness. *Williams*, 456 F.3d at 1363; *see also Clay*, 483 F.3d at 743. Livesay's sentence of no jail time and 6 months' home detention is utterly disproportionate to Livesay's serious crimes in light of the factors set forth in § 3553(a).

For example, the sentence wholly fails to take into account the serious nature and circumstances of Livesay's crimes and the need for his sentence to reflect the seriousness of his crimes. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A). Livesay knowingly participated in a massive and prolonged fraud of nearly $1.4 billion that harmed many individual and institutional victims, and Livesay only began to cooperate with the government after the fraud was exposed. *See Martin*, 455 F.3d at 1239–40. As HealthSouth's Assistant Controller, Livesay played a crucial supervisory role in the criminal conspiracy by not only falsifying HealthSouth's books and records himself, but also instructing HealthSouth's accounting staff to manipulate the books and records. Indeed, notwithstanding any early "repudiation" of the criminal conspiracy, Livesay did not legally withdraw from the conspiracy or notify authorities until the criminal conspiracy was discovered. Livesay participated in major league economic fraud that injured many individuals, institutions, and companies. *See id.; see also McVay*, 447 F.3d at 1357. In short, Livesay's sentence of probation wholly fails to account for the nature and circumstances of his participation in this massive fraud-based criminal conspiracy and the need for his sentence to reflect the seriousness of his crimes.

Moreover, Livesay's sentence of probation completely fails to account for the need to deter other would-be white-collar criminals. *See* 18 U.S.C. § 3553(a)(2)(B). In *Martin*, we observed that Martin's 7-day sentence "utterly fail[ed] to afford" such deterrence and noted that Martin's sentence, if allowed to stand, would send "the message ... that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *Martin*, 455 F.3d at 1240. The same holds true here with regard to Livesay's sentence of probation. As this Court noted in *Martin*, the legislative history of § 3553 reveals that Congress "viewed deterrence as 'particularly important in the area of white collar crime.'" *Id.* at 1240 (citation omitted). Livesay's sentence of probation—given the factual circumstances of this case, the major league economic crimes involved, and the advisory guidelines range of 78 to 97 months' imprisonment—thus undermines the purposes of § 3553 by utterly failing to provide deterrence. *See id.* at 1240.

Livesay contends that his situation is materially different from Martin's, and that we should not rely on *Martin* in evaluating either the reasonableness of the district court's § 5K1.1 departure or the reasonableness of Livesay's overall sentence. Livesay emphasizes that he was "a lower-level subordinate rather than a leader"; repudiated the conspiracy; and did not walk away with "millions in retained ill-gotten wealth." Livesay further argues that *Martin* does not stand for the proposition that any HealthSouth conspirator must receive a custodial sentence, or that a

7–day (or lower) custodial sentence is *per se* unreasonable for a defendant with a pre-departure offense level of 31 (or close to 31).

Livesay is absolutely correct that *Martin* does not stand for the proposition that all HealthSouth conspirators must serve prison time, or that a sentence of little or no prison time is *per se* unreasonable when a defendant's pre-departure offense level is near 31. After *Booker*, as Livesay recognizes, the specific facts and circumstances of each case must be considered individually in reviewing a sentence for reasonableness. *See Williams*, 456 F.3d at 1363. The problem for Livesay, however, is that under the specific facts and circumstances of his case, which are materially similar to the specific facts and circumstances of *Martin* in many significant ways, the district court's § 5K1.1 departure and overall sentence of probation are unreasonable.

Certainly, Martin was above Livesay in the HealthSouth hierarchy. Livesay reported to William Owens (the Controller), who reported to Martin (the CFO), and Martin undoubtedly had more "power, responsibility, prestige, [and] control" *vis a vis* Livesay—just as Livesay argues. But that does not mean that Livesay *lacked* power, responsibility, prestige, and control. Livesay, too, played a crucial, supervisory role in the conspiracy. For example, as Assistant Controller, Livesay did not merely follow the instructions of Martin and others above him in the HealthSouth food chain; he also instructed others in the key tasks in the offenses—making fraudulent entries in HealthSouth's books and records—and had full knowledge that HealthSouth was falsifying its books and records. Indeed, Livesay received a 3–level adjustment for his role in the conspiracy as a "manager or supervisor," and he

never objected to that adjustment. Thus, *Martin* is instructive, though not dispositive.

Similarly, Livesay contends that there is a "massive distinction" between himself and Martin in that Martin's net worth at sentencing was approximately $8.9 million, of which Martin only forfeited $2.375 million. Livesay's net worth at sentencing was $1.4 million, of which he forfeited $750,000. According to Livesay, Martin's sentence was unreasonable because "there are few among us who would not go to jail for seven days in exchange for retaining several million dollars," but Livesay's sentence of probation is *not* unreasonable because, financially speaking, "Livesay has been devastated." We disagree. First, Livesay received significant financial benefit from his part in the criminal conspiracy. We note that the PSI, based on tax returns, states that Livesay's adjusted gross income was $115,000 in 1992 and $107,000 in 1993. The criminal conspiracy began in 1994, and the PSI states that Livesay's crimes "occurred from at least in or about 1996" and continued until approximately November 1999. Livesay's annual adjusted gross incomes from 1994 through 1999 were, approximately and respectively: $569,000; $784,000; $808,000; $1,049,000; $822,000; and $227,000.

Further, even after his crimes and forfeiture payment, Livesay retained over half a million dollars. That is not an insignificant sum. Indeed, even though Livesay may have repudiated the conspiracy and refused to take further part in it while others continued, Livesay continued to work at HealthSouth and continued to take a paycheck from the company, without disclosing the continuing fraud (of which he knew and in which he had previously played a critical role) to anyone.[10]

---

**10.** According to the PSI, at the time of his termination in April 2003, Livesay's annual base salary was $240,000.

In the end, given the enormity of the crimes and Livesay's significant role in the underlying criminal conspiracy, we are "left with the definite and firm conviction" that Livesay's probation sentence is unreasonable. *Williams,* 456 F.3d at 1363; *see also Clay,* 483 F.3d at 743. As in *Martin,* Livesay's probation sentence "is not remotely commensurate with the seriousness and extensive scale of the crimes and does not promote respect for the law, does not provide just punishment for the offense, as § 3553(a)(2)(A) requires, and does not afford adequate deterrence to the criminal conduct here, as § 3553(a)(2)(B) mandates." *Martin,* 455 F.3d at 1241.[11]

## IV. CONCLUSION

For all of the foregoing reasons, we vacate Livesay's sentence and remand this case for resentencing in a manner consistent with this opinion.[12]

SENTENCE VACATED AND RE-MANDED WITH INSTRUCTIONS.

---

11. We reject Livesay's argument that *Martin* is further distinguishable because Livesay served a 6–month sentence of home detention while Martin did not. Martin's first sentence included 60 months' probation with a special condition of 6 months' home detention, which was admittedly vacated in the first appeal. However, in the second appeal, Martin's counsel made it quite clear to this Court that Martin had already served that 6–month sentence of home detention. *See* Brief of Appellee Michael Martin at *51, *Martin,* 455 F.3d 1227, *available at* 2006 WL 2703083 (Apr. 24, 2006).

In any event, we still readily conclude that Livesay's overall sentence, which included 6 months' home detention, is unreasonable for the reasons already discussed. We express no opinion as to what sentence is reasonable for Livesay, but only that this sentence is not.

12. As to the government's request that this case be reassigned to a different district judge on remand, we observe that the district judge has already recused himself from further participation in this matter. Thus, we need not address this request.